The next case on for argument is Charles and Small v. Orange County. Good morning, Your Honors. May it please the Court, I'm Daniel Stujanski with Simpson-Thatcher & Bartlett, counsel for plaintiffs Michelle A. Charles and Carol Small. This case is about a significant, well-established constitutional right. People who are confined by the government against their will have the constitutional right to be free from government officials' deliberate indifference to their serious medical needs. Under long-standing Supreme Court precedent, such deliberate indifference states a claim under Section 1983 for violation of plaintiffs' due process rights. The District Court erred in treating this case as unusual because of the specific type of medical needs and the specific type of medical care that's at issue, discharge planning for mental health conditions. The Court below imposed the wrong test and misapprehended the nature of plaintiffs' claims, as do the defendants. Notwithstanding these errors, the District Court still thought that this was a close question as to whether plaintiffs had stated a claim and ultimately granted defendants' motions for judgment on the pleadings. If we go too far down this road, I want to probe with you, if I may, Mr. Stujanski, whether there is in substance a special relationship, which the District Court sort of seemed to have assumed and then went on to the constitutional issue. I think there's two different special relationships here. I think it's undisputed there was a special relationship prior to the plaintiffs' release. I'm not arguing that, or sorry, questioning that. I'm not arguing at all. But I'm interested in sort of the tipping point and what happens when your clients are out the door and essentially free in the world. Your Honor is correct. The District Court determined that there was a special relationship that extended for some period of time after release. We don't think that this Court needs to reach that decision because what we allege was a deprivation that happened prior to release while the plaintiffs were in custody. What about when Mr. Charles shows up the next day after he's been released and asks if he can have medication? What role does that play in your complaint if the argument is the breach had already happened, basically, by the time he is released without any medication or a plan? That is our argument. We do have the alternative argument that there was a duty that extended beyond the period of time. So that allegation speaks to that. That is a theory that you're saying we don't need to reach that in order to reverse the District Court, but that is a theory that you are going to press in the District Court at some point? I think after discovery at the summary judgment stage or at trial, we'll see what the evidence bears. Your complaint fairly encompasses a claim to post-release care as well as a claim to planning for release. Our complaint is focused on the pre-release care. There is the allegation that he went back the next day and asked at that time for an interim supply of medication and was denied. That could speak to whether there was a breach of a post-release duty of care, if that exists, though it doesn't need to mandate reversal here. But that issue also speaks to the Monell issue, which was not reached by the court below, as to whether this was done pursuant to a custom, a practice, or an official policy. The custom that is referred to by the desk officer when Mr. Charles goes back is that we don't give any medication to people who are former prisoners. That is a custom, but that's only a problem if they're not allowed to have that policy because they are breaching some duty to former prisoners if they send them away. That's true, certainly not dispositive of the issue of whether there is a custom or practice of denying the pre-release care. We think it, at least at the pleading stage, could give certain plausible inferences about what the custom is about pre-release care. We also think that the interaction the next day are important allegations, and we think once discovery is conducted will be important evidence of deliberate indifference because the way that these people reacted when they learned that Mr. Charles had not received discharge planning and had not received interim medication certainly gives rise to the plausible inference that this was not just an oversight or an accident. What they did was they whacked up a discharge plan after he was already discharged, and then they refused him any medication at that point. Correct, and at the stage we're at now, which is at the pleading stage, what inferences can you draw from those acts? You can draw the inference that the failures that happened for the 12 months that Mr. Charles was in custody and for the 7 months that Ms. Small was in custody, the failure to conduct any form of discharge planning or take any steps to mitigate the risk that would face Mr. Charles and Ms. Small when they were released. So when does the breach occur? Does the breach occur when the person is released, or did the breach occur when somebody did not start planning for discharge on day one? I think it was an ongoing breach because the discharge planning was supposed to happen throughout their care, so the deprivation lasted in the case of Mr. Charles' 12 months. I'm trying to operationalize what's actually supposed to happen under your theory of the case. So suppose they had a discharge plan that said, well, when he goes home, he should get a certain supply of medication and he should get a referral and be told what he should do to take care of himself after he's out. And then he's sort of unexpectedly discharged at the hearing. We don't agree. He still wouldn't have his medication at that point, right? I mean, what happens then? So I think unexpectedly accepts defendants' versions of the facts here, which is not what should have been done below in the motion to dismiss stage. Well, what does your complaint say that would suggest that it was expected? So they at least knew that there was a chance that after appearing before an immigration court, that Mr. Charles would be released. So what they could have done if they knew he had a discharge plan, which required certain things to be given to him, they could have handed that information, they could have handed the interim supply of medication to the ICE officer for them to bring down to Varick Street. Every time you go to court, there's a possibility you'll be discharged, and so there should be a package given to somebody to make available to him in the event he's discharged. We don't believe this is an unworkable requirement. We don't think the court needs to tell them what to do. This Court could reverse and clarify that, in fact, this does state a claim for a constitutional violation. Because these are factual questions. It could be, for example, that it was totally unexpected and that Mr. Charles would not have a claim, but that would be a fact question that would be resolved at some later point. That would be a fact question. I don't know if we'd agree with the consequences of the legal consequences of the facts, as you've hypothesized, but certainly those facts are not dispositive, those unsubstantiated facts are not dispositive of the questions here. But we would also dispute that there's anything unworkable about what we're asking here. ICE's own policies require discharge planning. So presumably — Your policies provide the same thing for at least four detainees. For criminal prisoners. For criminal detainees. Exactly right, which further undermines the argument that they — And what is there that says that this is a policy that applies only to people detained pending criminal charges and not to ICE customers? So we've alleged in our complaint that ICE provides the discharge planning to — excuse me. Requires. That ICE requires it. We've alleged that the county provides it to people released from criminal detention at the jail. And, again, at the motion for judgment on the pleading stage, those allegations in the complaint are enough. The county actually put in an affidavit in support of their motion the actual policy that they claim applies. They say the policy applies to everyone, both civil detainees as well as criminal prisoners. I see. But that, again, is a factual issue you're suggesting. That's exactly right. I assume that that's true just because you're saying they have an actual policy of disregarding their written policy in the case of ICE detainees, given that you have some examples where those people did not get that treatment. That's exactly right. And the existence of the ICE policy and the purported existence of the county policy undermines any effort to say that this would be an unworkable requirement. So this is not in the record, at least as far as I can find. But are there any parallel proceedings going on in state court? I mean, this just, as an old torts lawyer, seems to me to be a series of tort claims that might do well in a state court setting, as opposed to being clad in constitutional terms. Your Honor is correct. This is not in the record. Mr. Charles did file an action in state court against the county. As Your Honor may know, New York State imposes a 90-day time limit on filing a notice of claim. And as we allege, during most of that period, Mr. Charles was in jail after experiencing a psychotic break. There's no tolling of that for being incompetent? Mr. Charles filed a petition for a late notice of claim. That was denied by the state court. It was appealed, and the decision was affirmed by the Appellate Division Second Department recently. Thank you. Thank you. Mr. Cardozo. Good morning. May it please the Court. My name is Anthony Cardozo. I represent the appellees except for Nicole Kaye. Judge Hall, I think you nailed it on the head. The threshold issue here is when the duty to provide medical care to a detainee under the Fourth Amendment ends. Now, the district court reached its decision, but I believe the easier answer, and the one that will resolve this case entirely, is that the Supreme Court's decision in De Cheney and this Court's prior decisions in Jacobs, Matican, and Lombardi all state that there has to be some lynchpin of custody. Here, these people are in custody. They're in custody, right? They're thrown out in custody, and they're getting medical treatment, right? Now, if you're getting medical care, so there is that relationship, and their argument is that this discharge planning is part of the care that they're supposed to get when they're in custody. So why can't we just talk about that rather than about a phantom argument that, with all respect to Mr. Studzinski, he seems to go back and forth on whether it's in the complaint at all about post-release duties. First, I'll say that the complaint clearly alleges a deprivation of post-release care. This argument about the in-custody care was created in response to my motion, and that's an argument we have in our brief. But to discuss it, discharge planning has nothing really to do with in-custody care. Both the plaintiffs agree they received adequate mental health treatment while in custody. So suppose, let's put the mental issue aside. Suppose someone's stabbed by a fellow prisoner, and the doctors at the facility know that he's going to be released tomorrow. So they dress the wound, do a perfectly good job of doing that, and then they put him on a bus, and nobody tells him, you have to change the dressing tomorrow. Nobody tells him, here's the number of a doctor to call if this seems to be starting to get infected. Nobody gives him any pain medication that he would normally be receiving. You're saying he got adequate care because they dressed the wound? The question is not, see, the question of this adequacy of care, the standard of care, those are tort questions. That's a negligence question, a medical malpractice question. No, no, no. It's a constitutional question if they're deliberately indifferent, and if they say, hey, we know that we'd do that if we were operating under ordinary malpractice rules and so on, but you're just a prisoner, and you're not going to be our prisoner tomorrow, so we don't care. Suppose they said that, and that's why they provided what was, in effect, malpractice care. That would state a constitutional claim, would it not? I do not agree that it would, only because the Supreme Court and the Second Circuit has repeatedly set a line at the discharge, meaning, and maybe it is unfair. When you say set the line at the discharge, you mean release from the institution? Release. So with Judge Lynch's hypothetical, you're saying if the person was stabbed and they dressed the wound, they released him the next day, and he bleeds out because they didn't provide him adequate information about dressing the wound, all of which happened before he left, there would not be a viable constitutional claim? The reason is because the result in Descheny was also unjust to that child. The result in Madacan was unjust. Perhaps the result in Lombardi was unjust, but it's— Those are cases in which the argument is the State has an obligation to protect people out on the street from what other people do to them. This is a question of what constitutes the adequate care that a prisoner is entitled to. It's as simple as that. Now, maybe you've got a great argument, and I think there are arguments to say this is not really part of the kind of care that they're entitled to, but the plaintiff's argument is this kind of discharge planning is what— When you go out on the street, when you go home, you have to do the following things for aftercare. If I go to the dentist, they tell me that. That's always part of medical treatment, isn't it? It is, and it's part of the standard of care, but in this case, this is a— And if you deliberately disregard the standard of care in a situation where there's a serious risk of terrible health consequences, is that not the very definition of deliberate indifference? But here, the injury—and we have to focus on the complaint that's before this Court. This is a motion to dismiss. Under Iqbal and Tuami, there have to be plausible facts. So here, the injury that these individuals suffered was— Well, Ms. Small didn't suffer any injury, but let's talk about Mr. Charles. He, two weeks later, decompensated. Even if the care—the injury was caused by the lack of medication not given to him post-release. That's post-release medical care. So we could have drafted and handed him a piece of paper. Here's your medications. Here's what you need to do. But at the same time, Mr. Charles had an ongoing relationship with a provider, could have obtained his own care, and that's what the cases say, is that when we're talking about the 14th Amendment, substantive due process standard, regardless of what else might be, maybe best practices, maybe whatever, the 14th Amendment only provides a duty of care when that person is in our custody. So when the plaintiffs are seeking medication post-release— It's not part of the duty of care when you know that somebody is going to be released. And this may not be the facts when it plays out and when we get all the facts about what actually happened in terms of the release of Mr. Charles. But let's assume for the moment, for the hypothesis, that they know that someone is going to be released the next day, and they know that he needs medication every day to deal with his health problems. They're not required to give him medication for the next day because he theoretically could find a health care provider in that day if that's the first thing he does. And they don't even have to tell him that, by the way, you need tomorrow to go get a prescription and fill it and get this medication. They don't have to do that because tomorrow is not their concern. That's your position. The position is that discharge planning only implicates post-release care. And I understand and I don't disagree that the result may seem harsh, but that is how the 14th Amendment works. Who said that? Who said? Is this not a question of, if not first impression, at least a kind of interesting twist? Where does it say anywhere that there is no duty to comply with what ordinary medical standards are in order to avoid serious health risks if that duty involves giving anybody any advice, any thought for what's going to happen to him the day he walks out the door? That's a proposition that the Supreme Court has endorsed? Tell me where. Well, I will say it is an issue of first impression, and that's why we're here. But every case that this Court has decided has said there has to be at the time that the duty arises. So the duty to Mr. Charles and Ms. Small arises. The injury that they're trying to ameliorate is this lack of medication when they get released. So that duty arises at a time when they are no longer under our custody. Other than the one district court decision that I'm aware of, every district court in the Second Circuit that has dealt with this issue has held that there is no duty once these people leave care. Right, wrong, indifferent, that is how it works. Once they leave custody. Once they leave custody. And we have the McGee case, the Anesty case. Those were very similar situations where someone is released without a treatment plan. I'm not saying it's right, but those were not constitutional violations. Perhaps they have a tort law. No, you are saying it's right. You're saying it's right that it's not a constitutional violation, that we should follow those district court decisions, that we need to decide whether they are right. And you're here to argue that they are. I believe that if we look just at the bedrock principles here of DeShaney and these other cases that this Court has decided routinely, is that even when it's not about the ends justifying the means, it's that here the 14th Amendment draws a line. The state has to have some control over the person at the time that the need arises. And to create... Just to be clear on that point, what you're saying is that even though the injury that they were supposed to be treating happened at the time that they were in custody, once they leave custody, regardless of whether or not the injury should have been treated or they should have had direction on how it should be treated after they leave custody, once they're out, you're done. So if the person in Judge Lynch's example, if the person bleeds out because they didn't know they needed to do X, Y, and Z, which the doctor failed to tell them while they were in custody, it doesn't really matter because now they're out of custody. Correct? That is the way... And unfortunately it's the way it has to work because the... Where does the line then end? How long after does the jail still become a medical provider? It's pretty simple. When you're putting him out the door onto the street, if he can't walk, you have to give him crutches. If he needs to change the dressing as soon as he gets home, you have to tell him he has to change the dressing as soon as he gets home. If he needs medication that night or the next day, you need to give him some medication, or at a minimum you need to tell him that he needs to get the medication and you need to maybe give him a prescription so that he can get it filled. That's not so hard. Indeed, that's what ICE requires you contractually to do. That's what you do according to your own policy. Your policy says you do that, and in writing it says you do it for Mr. Charles. So I'm not saying... I understand some theoretical arguments here, but I don't understand the notion of where will it all stop. We've got programs in place, apparently, for this. It's different if you have... The government can do things voluntarily, and it does not mean... I mean, this is what DeShaney was about, is that the state may very well create a system where this is allowed, but in that case, that child was injured extremely at the hands of the father and the state could have acted, but the Supreme Court did not require the state to act. That is the key difference here. It's the requirement to act, whether we do voluntarily act or not. Well, it's a requirement to act, and I think I have heard you say, it may have gotten swallowed up in the course of another question being asked, that the appellee's argument here is that it's not a constitutional tort. It may well be a tort. That horse is out of the barn, apparently, but it's not a constitutional tort. That's correct. I've read all the ones I could find, and that's the parameters that this Court has set up for the Substantive Due Process Clause. It's so far. So far. And I hope that that remains to be the case in line with the prior precedent. But at a minimum, I think that, especially with the unsettled nature of the question, Ms. Elizondo is certainly entitled to qualified immunity, and however the question is ultimately resolved on whether there's a duty, there's ample argument in the briefing that this is really a medical malpractice question and that the facts about supporting the Monell claim have not been pled as Iqbal and Twomley require. No, no, those things have been resolved by the district court. Am I right? They were raised below. This Court is free to. So we should sort of go off on Elizondo and decide that on our own without anybody looking at it but us. Well, I think just even Your Honor said that it's an issue of first impression, so that's almost a tailor made for qualified immunity. I think these issues can be resolved at this level, and should certainly be looked at, and it is in our brief. Thank you, Mr. Cardozo. Thank you. Excuse me, Mr. Stankiewicz. You've reserved three minutes. Thank you, Your Honors. I'd like to just talk about Descheny for a moment, because that seems to be the first principles that the defendant's argument seems to turn on. The boy in Descheny was not in government custody, and that's what the Supreme Court's analysis turned on, or if nothing else, that's the key distinction between this case and Descheny. Mr. Charles and Ms. Small could not have gone somewhere else to get discharge planning while they were confined at the detention center. That's the crux of why the Supreme Court requires people in custody to be provided medical care by the jail or prison where they're held. They weren't allowed to walk out the door and go to another psychiatrist and say, I might be released soon, help me get ready for that. Judge Lynch noted that maybe there might be an argument that this was not care that the plaintiffs are entitled to. I think at least as pled at the motion to dismiss stage, we've stated a claim that an abrupt termination of care poses a severe risk of harm to people with the mental conditions that plaintiffs are alleged to have, schizophrenia, bipolar disorders. These conditions left untreated can cause hallucinations, delusions, suicidal thoughts, breaks from reality. You said an abrupt disruption of care. I mean, it really is a question of what's the care that has to happen in custody and the extent of that care relates to post-custody. I mean, because you're not suggesting that if there is a sort of particularly acute condition and the person needs to be released that they should continue to confine the person until that condition is addressed. It's really what you're really arguing, I guess, is that there ought to be some plan to deal with medical issues that may have arisen at the time of custody, recognizing there could be consequences to that particular condition even after the person is released. That's right. And the discharge plan, as we alleged it, needs to include a discharge document summarizing the individual's diagnoses and medications. It should include an interim supply of medication where appropriate. But right now, we don't need to define what that ought to include. It's really the question of what's necessary for a particular individual at the time that they're released. And it may, obviously what it was, it may vary, and I'm not sure we need to specifically prescribe what that needs to be, correct? That's exactly right, especially given the procedural posture here and given the allegations that they did nothing to prepare for this. And you're also going to face causation questions down the road as to assuming they should have given medication for how long. You know, what would be an appropriate amount? You'd need medical testimony that, you know, maybe they don't need to give something for two days because you could go without for two days and not suffer problems. I'm just making this up, of course. That would be the subject of the medical testimony. And someone would have to decide, maybe a jury, maybe a judge on summary judgment, whether you've made an adequate case that the failure to provide what should have been provided, whatever that is, is causative of the problems because if the medical experts say, oh, you should give him at least a three-day supply of medication and he doesn't decompensate for two weeks and he could have and his family could have gotten him other treatment in the interim, you'd have issues about that. I mean, all of this is stuff that's down the road. That's exactly right. And that disposes of defendant's argument that perhaps even if he had been given a discharge plan, this still would have happened to him. Yeah, it could be. And that would be something that would have to be resolved at a trial or somewhere. Correct. We certainly allege causation at this stage. Thank you. Thank you. Thank you both. Helpful arguments. The final case for our consideration today is Ross v. Dempsey, uniform and linen supply. It's on submission.